**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**Case No.: 9:09-cv-80885-MARRA/JOHNSON**

**KARA JORUD,**

        **Plaintiff,**

**vs.**

**MICHAELS STORE, INC. d/b/a
MICHAEL'S ARTS AND CRAFTS and
SKIP SAND, individually,**

        **Defendants.**

_____/

**DEFENDANTS' POST-TRIAL BRIEF REGARDING PLAINTIFF'S
(1) HOSTILE WORK ENVIRONMENT CLAIM;
(2) FRONT PAY; AND
(3) LIQUIDATED DAMAGES**

      Defendants, Michaels Stores, Inc., d/b/a Michaels Arts and Crafts, and Skip Sand,

pursuant to this Court's oral and written orders on September 1, 2010 (Doc. 201) and September

10, 2010 (Doc. 203), hereby file this brief supporting Defendants' directed verdict on Plaintiff's

Americans with Disabilities Act ("ADA")/Florida Civil Rights Act ("FCRA") hostile work

environment claims and their positions on Plaintiff's entitlement to front pay and entitlement to

liquidated damages under the Family and Medical Leave Act.[1]

**I.**    **THE COURT SHOULD GRANT DEFENDANT'S[2] MOTION FOR DIRECTED
VERDICT ON PLAINTIFF'S ADA/FCRA HOSTILE WORK ENVIRONMENT
CLAIM.**

---

[1] Defendants maintain that they were and are entitled to judgment as a matter of law on all counts
and that Plaintiff is not entitled to any damages whatsoever. Thus, nothing in this brief is
intended as an admission or waiver of any arguments that may be presented in the future,
including motions pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure.

[2] Mr. Sand is not a named defendant with respect to Plaintiff's ADA/FCRA claims.

Judgment as a matter of law, or directed verdict, under Rule 50 is appropriate if a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue. Fed.R.Civ.P 50(a)(1)(A).  For a motion for judgment as a matter of law, the court should review all of the evidence in the record.  *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

A.      **Plaintiff Cannot Establish a *Prima Facie* Case of Hostile Work Environment under the Americans with Disabilities Act or the Florida Civil Rights Act.**

As a threshold matter, it is not clear that an action for hostile work environment exists under the ADA/FCRA.  *See Fikes v. Wal-Mart, Inc.*, 322 Fed.Appx. 882, 884 (11th Cir. 2009) ("We express no opinion on whether a hostile work environment claim is cognizable under the ADA."); *Woodruff v. School Bd. of Seminole County, Fla.*, 304 Fed.Appx. 795, 799 (11th Cir. 2008) (assuming without deciding that such a claim exists).  Therefore, Defendant requests that the Court decline to find that an action for ADA/FCRA hostile work environment exists, and grant Defendant's motion for judgment as a matter of law on this basis.

Assuming, *arguendo*, that the Court recognizes a hostile environment claim under the ADA/FCRA, "[t]hose courts which have proceeded under the assumption that an ADA hostile environment claim could be actionable, have analyzed the plaintiffs' claims under the same rubric used in assessing hostile work environment claims brought pursuant to Title VII." *Schwertfager v. City of Boynton Beach*, 42 F.Supp 2d 1347, 1366 (S.D. Fla. 1999) (citing *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir.1998) and *Rio v. Runyon*, 972 F.Supp. 1446, 1455 (S.D. Fla.1997)).

In order to establish a *prima facie* case of hostile work environment under the ADA or the FCRA, therefore, a plaintiff must establish that: (1) she belongs to a protected group (i.e., she

is disabled/handicapped under the ADA/FCRA); (2) she was subjected to unwelcome harassment; (3) the harassment to which she was subjected was based on a disability/handicap; (4) the harassment complained of affected a term, condition, or privilege of her employment; and (5) the employer knew or should have known of the harassment, but failed to take prompt, remedial action. *See Rio v. Runyon*, 972 F.Supp. 1446, 1459 (S.D. Fla. 1997) (citing *Henson v. City Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982))[3]. To be actionable, the harassment must be so severe or pervasive as to have "the purpose or effect of unreasonably interfering with [Plaintiff's] work performance or creating an intimidating, hostile, or offensive environment." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986); *see also Henson*, 682 F.2d at 904. To do this, Plaintiff must show that her workplace was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). Additionally, the work environment must be both objectively offensive (one that a reasonable person would find hostile or abusive) and subjectively offensive (one that the victim in fact did perceive to be so). *Id.* at 21-22 (emphasis in original). These are demanding standards for judging abusive working environments and were designed to prevent civil rights statutes from becoming "general civility

---

[3] Any Title VII or Rehabilitation Act cases cited in this memorandum are applicable in the ADA context and the state FCRA context. The disability-based hostile environment claim in *Rio v. Runyon* is based on the Rehabilitation Act, since the plaintiff in *Rio* was a federal employee and a federal employee's exclusive remedy for disability discrimination is the Rehabilitation Act. *Rio*, 972 F.Supp. at 1455. Disability claims under the Rehabilitation Act and disability claims under the federal ADA should be analyzed consistently. See *Rio*, 972 F. Supp. at 1455, n.9. Disability-based hostile environment claims are analyzed under the Title VII standards for gender-based hostile environment claims. *Rio*, 972 F.Supp. at 1459. State FCRA claims are analyzed using federal ADA standards and case law. *Greene v. Seminole Electric*, 701 So. 2d 646 (5th DCA Fla. 2001) (with respect to handicap discrimination, the FCRA should be construed in conformity with the Rehabilitation Act and ADA).

code[s]." *Schwertfager v. City of Boynton Beach*, 42 F.Supp 2d at 1367 (citing *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998)); *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

In the testimony given and the evidence presented during trial, Plaintiff failed to establish her hostile work environment claims under the ADA and FCRA because she failed to present any evidence: (1) that the alleged harassment was based on her disability or handicap; or (2) that the harassment was sufficiently severe or pervasive to alter the conditions of her employment. As such, the Court should grant the Defendants' motion for directed verdict on Plaintiff's ADA/FCRA hostile work environment claim.

> 1.  Plaintiff Failed to Establish the Third Required Element – That The Alleged Harassment to Which She was Subjected was Based on Her Disability.

In order for objectionable conduct or language to rise to the level of harassment, "the harassment must discriminate on the basis of a protected characteristic" – in this case, Plaintiff's breast cancer disability. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 fn. 3 (11th Cir. 2010) (emphasis added). Plaintiff presented no evidence during trial establishing that any of Michaels' or Skip Sand's actions or comments were based upon her breast cancer.

To the contrary, Plaintiff testified that many of the negative statements and actions she attributes to Mr. Sand[4] began well before her breast cancer diagnosis (on or around July 30, 2008). Trial Tr. at 205-08, 218.[5] In fact, Plaintiff admitted that her negative impression of Mr. Sand began when he first assumed his role as her new District Manager in February 2008. Trial

---

[4] For purposes of the motion for judgment as a matter of law and this supporting memorandum, Defendants assume that Plaintiff's testimony and evidence regarding Michaels and Mr. Sand's comments and actions are true. Outside the context of this motion and memorandum, Defendants strongly maintain that many of the attributed comments and actions are untrue.

[5] Citing to the Trial Transcript previously filed with this Court.

Tr. at 204, 206-08.   Plaintiff testified that after becoming her District Manager, Mr. Sand engaged in the following behavior – all of which occurred before Plaintiff, and therefore Mr. Sand, knew about her cancer:

- refused to give her "comp" days in March 2008, Trial Tr. at 205;

- called her back to work while she was on vacation in April 2008, *Id.* at 205-06;

- became very critical of "everything she did," *Id.* at 208, 212;

In addition to the comments/actions listed above, another negative action alleged by Plaintiff was her low store ratings.  Like the comments/actions listed above, these "C" and "D" store ratings began before Plaintiff's cancer diagnosis – even before Mr. Sand became Plaintiff's District Manager.  Trial Tr. at 550.  Consistent with Defendants' position that none of these comments or actions had anything to do with Plaintiff's breast cancer, these "C" and "D" rating continued after Mr. Sand became District Manager and through the time of Plaintiff's termination.  *Id.* at 566.

Comments made and behavior displayed before knowledge of a disability simply cannot be based on or caused by the disability.  Therefore, because Sand did not create a hostile environment for Plaintiff based on her breast cancer, Plaintiff's disability-based hostile environment claim fails.

Likewise, none of the post-July 2008 comments and actions Plaintiff attributes to Mr. Sand are sufficiently tied to her cancer to establish the requisite link.  After her cancer diagnosis in late July 2008, Plaintiff contends that Mr. Sand took the following actions and made the following comments:

- sent her an email on August 4, 2008, and on September 21, 2008, in which he was "yelling" at her about payroll, Trial Tr. at 214-215, 245-46, Plaintiff's Exhs. 109, 111[6];

- asked her if she could postpone her lumpectomy in order to conduct inventory, *Id.* at 216;

- called her "a lot" inquiring how much time off she would need for her double mastectomy; called "quite a bit" while she was out, indicating that he needed her at the store and wanted her to come back to work,[7] *Id.* at 221, 223;

- got upset and angry, stomped his feet, threw a pen across a desk, and made "gestures," when Plaintiff advised that she would be out of the store for chemotherapy treatments, *Id* at 229;

- after examining the condition of the store, pointed at her in front of her assistant manager and stated, "You better get this fixed or you might as well get your resumes together," *Id.* at 231;

- got upset and "very, very angry" when she was unable to come to work after a chemotherapy session, *Id.* at 249;

- after seeing an inappropriately displayed sale sign, took the sale sign down and threw it across a desk; *Id.* at 282;

- told Plaintiff that her "ass was grass" if the condition of the stock room did not improve, *Id.* at 299; and

---

[6] Plaintiff characterizes Mr. Sand's email as directed to her despite the fact that Assistant Store Manager Michelle Sluder was in charge of scheduling employees and employee payroll (the subject of the email), the store email address to which Mr. Sand sent the email was accessible to and reviewed by Assistant Store Manager Sluder in addition to Plaintiff (Trial Tr. at 815, 821), and Ms. Sluder (not Plaintiff) answered Mr. Sand's email (Trial Tr. at 820-22, Pl's Exh. 111) because it pertained to payroll.

[7] Plaintiff's testimony on the issue of Mr. Sand's phone calls to her vacillated. In addition to testifying that Mr. Sand called her "quite a bit," she also testified that Mr. Sand called her "every single day" while she was out on leave. *Id.* at 225. However, the unrefuted evidence presented during the trial showed that during the period of time Plaintiff was on leave, Mr. Sand placed four (4) calls to Plaintiff, far less than the "every day" or "quite a bit" telephone calls to which Plaintiff testified. These four calls lasted a total of approximately 14 minutes. Trial Tr. at 561-63, Def's Exhs. 80, 100. The unrefuted record illustrates that Plaintiff called Mr. Sands six (6) times during the period she was on leave, for a total of 30 minutes. *Id.* Mr. Sand testified that he does not have a home phone, rarely used the store phones ever, and uses his cell phone as his major communication source. Trial Tr. at 562-63. This testimony was uncontradicted by Plaintiff.

- told Plaintiff "that's gross" when she pulled out some of her hair to illustrate to Mr. Sand that she was losing her hair as a result of the chemotherapy treatments, *Id.* at 313

Three of these alleged comments/actions have absolutely nothing to do with breast cancer:

- after examining the condition of the store, pointed at her in front of her assistant manager and stated, "You better get this fixed or you might as well get your resumes together," *Id.* at 231[8];

- after seeing an inappropriately displayed sale sign, took the sale sign down and threw it across a desk; *Id.* at 282; and

- told Plaintiff that her "ass was grass" if the condition of the stock room did not improve, *Id.* at 299.

"Although [disability]-specific language that imposes a change in the terms or conditions of employment based on [a disability] will violate [the ADA], general vulgarity or references . . . that are indiscriminate in nature will not, standing alone, generally be actionable." *Reeves,* 594 F. 3d at 809 (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998). As such, in order for Mr. Sand's comments or actions to be actionable, they must be "disability-based" comments, rather than comments made in reaction to either Plaintiff's job performance or the condition of the store. *Schwertfager v. City of Boynton Beach,* 42 F.Supp.2d at 1367 (finding that blunt criticism and an employee being told she was "useless" were not "disability-based" comments, but rather reactions to the employee's work performance); *see also Rio v. Runyon,* 972 F.Supp. at 1449-51, 1459-60 (stating that supervisor's criticism of employee and remarks were attributable to work performance and not her disability). These comments and actions fail to satisfy the "harassment based on disability" requirement for a hostile environment claim.

---

[8]  Despite Plaintiff's belief that Ms. Sand's comment was directed at Plaintiff and her alone, Mr. Sand and Ms. Sluder testified that his comment was directed to a broader audience, either Mr. Sand, Plaintiff, and Ms. Sluder (Trial Tr. at 565-67), or, at a minimum, Plaintiff and Ms. Sluder, (Trial Tr. at 829).

None of the other comments and actions attributed to Mr. Sand satisfies the high standard required to find linkage between comments/actions and a protected characteristic/disability.  *See, e.g., Marcelin v. Eckerd Corporation,* 2006 WL 923745 (M.D. Fla. 2006) (citing *Orenge v. Veneman*, 218 F.Supp.2d 758, 767-68 (D. Md. 2002) (five allegedly racist remarks by supervisor – including a comment on the O.J. Simpson trial that whites would never trust blacks again, a statement that blacks are trying to get a free ride, and some "you people" type comments – were insufficient to cause a reasonable person to believe that supervisor's actions were motivated by racial animus)); *Dunlap v. Kansas Dep't of Health & Environment*, 211 F. Supp 2d. 1334, 1340-42 (D. Kansas 2002) (supervisor who used foreign accent to mock unintelligent questions and pretended several times not to understand employee's accent did not, even if true, establish that employee's ancestry was being targeted by complained-of actions).

The only comments/actions which are even arguably related to breast cancer are Mr. Sand's alleged comments regarding Plaintiff's postponing her lumpectomy in order to conduct inventory; his calling her "a lot" inquiring how much time off she would need for her double mastectomy; his anger, stomping his feet, throwing pen across a desk and "gestures" when Plaintiff advised she would be out of the store for chemotherapy treatments; his "that's gross" comment when Plaintiff pulled out some of her hair; and his alleged anger when Plaintiff was unable to come to work after a chemotherapy session.  Assuming, *arguendo*, that all of these comments and actions occurred as characterized by Plaintiff, they were either insensitive remarks ("that's gross" which Plaintiff agreed it was, Trial Tr. 313) or based on legitimate, non-discriminatory business reasons and, therefore, not linked to her breast cancer or supportive of a disability-based hostile environment claim.  Comments and actions based on business reasons, not a disability, are not actionable and may not be used to establish a disability-based hostile

environment claim.  *See Rio*, 972 F.Supp. at 1459 (finding that an employee did not have a viable hostile environment claim when the employee "routinely misperceived and personalized events in the workplace [and] . . . viewed all supervisory actions as sinister when they were merely work directives consistent with the supervisors' duty to manage the [workplace]"; holding that, while employee received blunt criticism, such remarks were attributable to "work performance," not to any disability.)

Any comments or actions were based on legitimate business motivations.  For example, on the day Plaintiff alleges Mr. Sand instructed her to get her resume together, the store had received a "D" rating.  *Id.* at 566, 829.  As the District Manager, Mr. Sand was ultimately responsible for ensuring that the stores in his district were performing and meeting company standards.  *Id.* at 566-67.  As the store manager of the Boca Raton store, Plaintiff was responsible to ensure that her store was meeting company expectations and performing up to standard.  *Id.* at 566.  It is uncontested that that the condition of the store was not meeting expectations, both before and after Plaintiff was diagnosed with cancer.  *Id.* at 550.  Consequently, the evidence shows that any frustration by Mr. Sand with the condition of the store and its lack of improvement were related to those business conditions, not Plaintiff's breast cancer.  As to the alleged comment that her "ass was grass," if true, which Mr. Sand strongly disputes, it was made in direct relation to the condition of the store.  Furthermore, no evidence was presented during the trial that Mr. Sand's allegedly stomping his feet, throwing pens and/or signs, or other similar conduct was motivated by anything other than a desire to improve an underperforming store – a desire which began months before Plaintiff's cancer diagnosis in late July 2008, according to Plaintiff's own testimony.  Trial Tr. at 205-06, 208, 212.

Plaintiff paints Mr. Sand as the one who created her allegedly intolerable work environment. No other evidence exists that the actions or comments of others created or supported a hostile work environment based on Plaintiff's disability.

Plaintiff's allegations that Mr. Sand wanted to have her fired because she was the "weak link" and that Michaels management willingly went along with Mr. Sand's personal vendetta to get rid of her are completely unsubstantiated. Other than Plaintiff's own speculation and subjective belief, there is no evidence that this was true. Plaintiff's failure to present any substantive evidence that any alleged conduct and remarks were *based on* her disability is fatal to her hostile environment claim. As such, Defendant's motion for directed verdict should be granted.

      2.     <u>Plaintiff Failed to Establish the Fourth Element – That The Alleged Harassment Was Sufficiently Severe or Pervasive to Affect a Term, Condition, or Privilege of Her Employment.</u>

Plaintiff also failed to provide any testimony or present any evidence that the alleged comments and actions were sufficiently severe or pervasive to affect a term, condition, or privilege of her employment. The severe or pervasive requirement is the element that tests the mettle of most harassment claims. *Scott v. Publix Supermarkets*, No. 07-60624, 2008 WL 2940672, 4 (S.D. Fla., July 28, 2008).

The standard for proving a hostile work environment is a demanding one. The conduct complained of must be "persistent and routine rather than isolated or sporadic in nature in order to be sufficiently severe [or] pervasive as to alter the conditions of a plaintiff's employment." *Prado v. L. Luria & Son, Inc.,* 975 F.Supp.2d 1349, 1355 (S.D.Fla.1997). Harsh words and actions alone cannot be elevated to the level of an actionable workplace offense. *Schwertfager*, 42 F. Supp.2d at 1367 (citations omitted). "The concept of . . . harassment is designed to protect

working [individuals] from the kind of . . . attention that can make the workplace hellish . . . .  It is not designed to purge the workplace of vulgarity."  *Rio,* 972 F.Supp. at 1459 (citations omitted).

In considering whether conduct and statements have affected a term, condition or privilege of employment, courts in the Eleventh Circuit consider four factors:  (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with her job performance. *See Freytes-Torres v. City of Sanford*, 270 Fed. Appx. 885, 889 (11th Cir. 2008) (citing *Mendoza v. Borden, Inc.,* 195 F. 3d 1238, 1246 (11th Cir. 1999)).  As established below, Plaintiff presented no evidence at trial sufficient to establish any of the required elements to prove a hellish workplace.  Instead, the comments and actions attributed to Mr. Sand and other Michaels managers fall painfully short of this demanding standard.

(a)  Skip Sand

i. *The conduct was not frequent.*

Occasional adolescent, rude or insensitive comments are not sufficiently severe or pervasive to create the type of hellish environment that is unlawful.  *See Rio,* 972 F.Supp. at 1460.  The requisite frequency standard is demanding.  *See Reeves*, 525 F.3d at 1146 (finding offensive language used nearly every day for three years was sufficiently frequent); *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1248 (11th Cir. 2004) (finding conduct frequently severe or pervasive when comments and acts of groping occurred eighteen times in a two-week period); and *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1276 (11th Cir. 2002) (finding that harassing comments hurled at an employee every day for one month was sufficiently frequent).

Here, Plaintiff was diagnosed with cancer on or around July 30, 2008, and was terminated on October 16, 2008.  Trial Tr. at 218, 334.  According to Plaintiff, during the time after her diagnosis, Mr. Sand engaged in the following events:  used an expletive on one occasion ("your ass is grass"); sent two emails which Plaintiff interpreted to be Mr. Sand "yelling" at her regarding payroll issues; threw a pen and a sign; stomped his feet; made "gestures" on two or three occasions; commented "that's gross" when Plaintiff pulled out her hair; pointed at Plaintiff one time and told her to get her resume together; called her either "a lot" or "every single day;"[9] and was frequently upset.  *See* cites on pages 5-6 *infra*.  These incidents did not occur frequently enough to have objectively created a hostile work environment.  While these incidents may have been offensive to Plaintiff, they were far too isolated and sporadic to establish the requisite frequency needed to support a hostile work environment claim.  *Harris*, 510 U.S. at 22 (stating that conduct that is not severe or pervasive enough to create an "objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's [and the ADA's] purview.")  The actions and comments testified to by Plaintiff cannot be put in the same category as those in the *Reeves*, *Hulsey* or *Miller* cases and do not, as a matter of law, meet the frequency requirement.  As such, the conduct of which Plaintiff complains amounts to occasional rude and/or insensitive acts, not unlawful workplace harassment.

### ii. The conduct was not severe.

Plaintiff also presented no evidence during trial establishing that Mr. Sands' conduct was sufficiently severe to establish unlawful workplace harassment.  The most serious allegations Plaintiff levels against Mr. Sand – almost all without corroborating testimony from other

---

[9]  See footnote 6.

witnesses – are that he stomped his feet; threw a pen and sign across a desk (though not at Plaintiff); used capital letters and exclamation marks in two emails; called her "a lot" or "quite a bit" while she out on leave; "advised Plaintiff that she should get her resume together if the condition of the store did not improve; and told Plaintiff her "ass was grass" if the stockroom was not in order.[10]   These actions and comments do not rise to the level of being sufficiently severe to sustain a hostile work environment claim.   *See, e.g., Avdyli v. Barnhart, Comm'r of SSA,* 2007 WL57601 (N.D. Ill 2007) (numerous instances of a supervisor and others recruited by supervisor stomping their feet in or near Plaintiff's work area, along with other actions and comments, not sufficiently severe or pervasive); *Fleming v. Maxmara USA,* 371 Fed. Appx. 115, 2010 WL 1170247 (C.A.2 (N.Y.) Mar. 2010), 108 Fair Empl.Prac.Cas. (BNA) 1779 (although supervisor threw books, sent rude emails to Plaintiff, excessively criticized Plaintiff's work, made one racial epithet, excluded Plaintiff from meetings, refused to answer work-related questions, and arbitrarily imposed duties outside of Plaintiff's responsibilities, conduct and statements not pervasive or severe); *Divers v. Metropolitan Jewish Health Systems,* 2009 WL 103703, E.D.N.Y., January 14, 2009 (supervisor's actions of shouting at Plaintiff and tossing papers and files on her desk, cursing at plaintiff, and using a forceful and demanding tone not severe or pervasive)*; Scott v. Memorial Sloan-Kettering Cancer Center,* 190 F.Supp.2d 590 (S.D.N.Y. 2002) (comments complained about by plaintiff were made in the context of her supervisor asking her whether she would return to work; Court found it reasonable for an employer to ask when an employee will be able to perform her job, citing *Harris v. Home Savings Assn*., 730 F.Supp. 298, 307 (W.D.Mo.1989) (holding that it is part of the normal course of business for an employer to ask an employee when she plans to return to work)).

---

[10] It is important to note that Plaintiff never alleged Mr. Sand ever touched her in any way.

Again, the actions and comments testified to by Plaintiff cannot be put in the same category as those in the *Avdyli, Fleming, Divers* or *Scott* cases and do not, as a matter of law, meet the severe requirement. Plaintiff has therefore failed to present the requisite evidence that Mr. Sand engaged in actions or comments that rose to the level of being sufficiently severe to sustain a hostile work environment.

### *iii. The conduct was not physically threatening or humiliating.*

Plaintiff also failed to present evidence that Mr. Sand's conduct was physically threatening or humiliating. At no time did Plaintiff testify that Mr. Sand became physically aggressive or engaged in any physically threatening behavior toward her. Although Plaintiff testified that he threw a pen and a sign, she did not testify that they were thrown at her or in her direction. In fact, when asked by her own counsel how Mr. Sand's alleged yelling and "throwing things and stomping his feet" made her feel, Plaintiff did not testify that she felt afraid or physically threatened. Trial Tr. at 229-230, 244, 246.

Plaintiff did testify that she was scared of Mr. Sand when he called on October 13, 2008, and said he was going to pick her up from the Boca Raton store later in the day. Trial Tr. at 312-13. However, Plaintiff testified her fear was because she though she would be fired <u>and not</u> because she was being physically threatened. *Id.* Plaintiff testified that when she learned Mr. Sand had called her to take her out to coffee, she was relieved. *Id.* Notably, this was the meeting during which Mr. Sand apologized to Plaintiff – hardly threatening.

Plaintiff also did not present any evidence that Mr. Sand engaged in any physical contact with Plaintiff. Her greatest fear, according to her, was that she would lose her job as Store Manager. Trial Tr. at 312. Since Plaintiff did not present evidence that Mr. Sand's comments or

treatment of her were physically threatening or humiliating, she failed to satisfy the third factor to prove an unlawful hostile workplace.

> ### iv. The conduct did not unreasonably interfere with Plaintiff's job performance.

Plaintiff did not present any evidence that Mr. Sand's allegedly hostile conduct unreasonably interfered with her job performance. In fact, after her diagnosis of breast cancer and up until her termination, Plaintiff's work performance was average and she was not written up or disciplined in any way. Trial Tr. at 367, 208. According to Plaintiff, it was only while she was out on leave and not working that the store was "run amuck." *Id.* at 253; Plaintiff's Exh. 100. Plaintiff also presented no evidence that Mr. Sand's conduct prevented her from performing the functions of her job as Store Manager. To the contrary, her testimony was that she worked hard to ensure that Mr. Sand could not follow through on what she perceived to be his plan to fire her from her position as Store Manager. Trial Tr. at 230-31, 243-44, 246-47, 252-53, 321. Since Plaintiff has not presented evidence that Mr. Sand's conduct unreasonably interfered with her job performance, she has failed to establish the fourth factor necessary to prove an unlawful hostile environment.

> ### (b)   Other members of Michaels management.

Plaintiff has presented no testimony or evidence that the statements and actions of any Michaels manager other than Mr. Sand were <u>directly</u> responsible for creating a disability-based hostile work environment.[11] However, Plaintiff likely will argue that the actions or inactions of certain Michaels managers (including VP of Operations Nick Crombie or Zone Human

---

[11]  Plaintiff's allegation that her ultimate termination was motivated by disability discrimination and/or unlawful retaliation are the bases for Plaintiff's ADA/FCRA discrimination and ADA/FCRA retaliation claims, not the ADA/FCRA hostile environment claim at issue in this motion and supporting memorandum.

Resources Director Shawn Gingrich) contributed _indirectly_ to her allegedly hostile work environment.

Significantly, Plaintiff has presented absolutely no evidence that Mr. Crombie or Mr. Gingrich's statements or actions/inactions were frequent/pervasive, severe, physically threatening or humiliating, or unreasonably interfered with her job performance. Therefore, because there has been no evidence regarding the four factors used by the Eleventh Circuit in evaluating whether statements and conduct have affected a term, condition, or privilege of employment, the statements and conduct of Mr. Crombie and Mr. Gingrich cannot form the basis for Plaintiff's hostile environment claim.

As presented at trial, Nick Crombie's role and actions in this case – and therefore, the times at which he could have conceivably created a hostile environment for Plaintiff – were very limited. Mr. Crombie responded to the email from Plaintiff dated September 29, 2008, forwarded Plaintiff's concerns to Human Resources, visited her store twice, spoke with Plaintiff about her requested accommodations, and granted those accommodations. See Trial Tr. at 279-80, 286, 288, 290-92. Each of these actions was appropriate and, in a brief 10-day period, resulted in an agreement to allow all of the accommodations Plaintiff requested.

Similarly, Mr. Gingrich's investigation of Plaintiff's September 29, 2008 email complaint regarding Skip Sand was both reasonable and appropriate. "Whether an employer takes appropriate remedial action, under Title VII . . . upon learning of hostile environment, depends on particular facts of case, including severity and persistence of harassment, and effectiveness of any initial steps." _Joseph v. Publix Super Markets, Inc_. 983 F.Sup1431, 1442 (S.D. Fla., 1997).

Mr. Gingrich testified he received the email complaint on October 2, 2008, while he was on vacation.[12]   Trial Tr. at 1002.  He immediately contacted Michaels' benefits department and instructed an employee, Debra Cope, to look into Plaintiff's short term disability (STD) question. Trial Tr. at 1003.  That day he also called his supervisor, VP of Human Resources Mike Stine, who assigned Mr. Gingrich the duty of investigating in detail the contents of the email and reporting back to Mr. Stine on the findings and any recommendations that Mr. Gingrich might have.  Trial Tr. at 1004.  Once back to work, Shawn Gingrich called Plaintiff on October 7th, but since Plaintiff was not working that day, they spoke early in the morning on October 8, 2008.  *Id.*

Mr. Gingrich testified he and Plaintiff discussed each point in her email, and that Plaintiff's major concern was the denial of her STD.  Trial Tr. at 1005, 1007-10.  Mr. Gingrich also spoke with Skip Sand and they discussed, among other things, the resume comment and the operational deficiencies in the store.  Trial Tr. at 1013-14.  Significantly, Mr. Gingrich testified that Mr. Sand did not have any problem with Plaintiff's taking time off work to tend to her cancer treatments; rather, he stated he simply needed notice of when Plaintiff could not show up for her scheduled shifts.  Trial Tr. at 1016.  Later that same day of October 8, 2008, Mr. Gingrich learned of Nick Crombie's accommodations for Plaintiff of a co-manager (Jim Kayser) and additional payroll hours each week.[13]  Trial Tr. at 1016-17.  Mr. Gingrich testified that he instructed Mr. Sand to arrange Mr. Kayser's transfer to the Boca Raton store, they discussed the poor communication between Skip Sand and Plaintiff, and Mr. Sand assured Mr. Gingrich that next time he was in Plaintiff's store, he would meet with Plaintiff and sit down and talk with her about their concerns. Trial Tr. at 1018.  True to his word, Mr. Sand and Plaintiff met on October

---

[12] Although his name appears as an original recipient of the email, his email address was misspelled and he received the email from his supervisor, Mike Stine.  Trial Tr. at 1002.

[13] These accommodations were in addition to the Manager-in-training and other visiting managers who had recently been helping out at the Boca Raton store.  Trial Tr. at 1011-12.

13, 2008, and had coffee together.  Trial Tr. at 1020.  Mr. Gingrich testified that he thought the controversy between Skip Sand and Plaintiff was over.  Trial Tr. at 1017.

Although Plaintiff will likely quibble that Mr. Crombie's or Mr. Gingrich's actions should have occurred faster, they occurred in a timely manner.  The failure to meet Plaintiff's subjective desire for a certain action (i.e., a quicker resolution) does not establish a hostile environment claim.  *See Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1306 (11th Cir. 2007) (holding that although the plaintiff was unsatisfied with the resolution of her complaint, the court has never stated that a complainant in a discrimination action has a right to impose the remedy of her choice).  Although a company's failure to take any action in response to a hostile work environment complaint would be inappropriate (which is not the case here), Plaintiff's insistence that the company's response be exactly as she subjectively would like is not reasonable.  *Id.*  To prove that inaction or delay contributed to or caused a hostile environment claim, the Plaintiff must show that the employer was aware of the harassing conduct and did nothing to stop it.  *Mortenson v. City of Oldsmar*, 54 F. Sup2d 1118, 1122-23 (M.D. Fla. 1999) (denying employer's motion for summary judgment finding that an issue of fact existed as to whether the employer took reasonable care in preventing harassing behavior when evidence was presented that the employer did not investigate the employee's complaints until several months after she first reported the harassment).  In this case, Michaels had an anti-harassment policy with complaint procedure and Plaintiff was aware she could complain about workplace harassment.  Trial Tr. 734; Pl's Ex. 24 at pp. 7-8.  Michaels' management promptly responded and conducted an investigation when it received Plaintiff's September 29, 2008 email.  After Michaels investigated her complaint, it put into effect corrective measures that would address the situation as described by Plaintiff.   Even Plaintiff did not believe that the

18

environment was hostile as evidenced by her failure to complaint to Mr. Gingrich, Mr. Stine, or even Mr. Crombie after Michaels addressed her concerns.

As shown above, in the event Plaintiff attempts to argue that Michaels management personnel other than Mr. Sand created a hostile working environment, that argument is without merit and should not be considered by this Court.

**B.    Conclusion.**

Plaintiff wholly failed to establish the necessary elements of her hostile work environment claims.  First, she did not present any evidence that any conduct or comments were made because of her disability.   Second, she failed to produce evidence to establish that any conduct or comments were sufficiently severe or pervasive enough to affect a term, condition or privilege of her employment with Michaels.

An analysis of the factors cited by the Supreme Court in *Harris v. Forklift Systems, Inc.* must lead this Court to conclude that the actions and statements of Mr. Sand and other Michaels managers do not constitute a violation of the ADA or FCRA.  While Mr. Sand's alleged conduct could be construed as perhaps demanding in nature, it occurred infrequently, was not severe, was not physically threatening or humiliating, and did not unreasonably interfere with Plaintiff's job performance.   Therefore, the "harassment" Plaintiff allegedly endured was not, as a matter of law, sufficiently severe or pervasive to alter the conditions of employment and create a discriminatory hostile working environment.  Consequently, this Court should grant Defendants' motion for directed verdict, as no reasonable jury, given the facts and evidence presented during trial, could have found a legally sufficient evidentiary basis to find Plaintiff was subjected to the requisite "hellish" work environment because of her breast cancer.

II.     **PLANTIFF IS NOT ENTITLED TO FRONT PAY.**

This Court ordered Defendants to brief the issue of front pay on or before September 29, 2010.   Accordingly, Defendants submit this brief in compliance with that order.   Defendants respectfully request that they be allowed to supplement this brief after Plaintiff briefs this issue as it is Plaintiff's burden to show entitlement to damages.  *See, e.g., Thorson v. Geminin, Inc.*, 96 F.Supp.2d 882, 891 (N.D. Iowa 1999) ("The plaintiff bears the initial burden of proving the essential data necessary to calculate a reasonably certain front pay award . . . .").

A.     **Plaintiff Has Waived Any Claim For Front Pay Under The ADA And FCRA.**

By her Second Amended Complaint, Plaintiff requested an award of front pay based on Defendants' alleged violations of the Family and Medical Leave Act ("FMLA") only.  *See* Counts I and II of Doc. 13.  Thus, Plaintiff cannot now seek front pay with respect to her claims under the Florida Civil Rights Act ("FCRA") or the Americans with Disabilities Act ("ADA"). *See, e.g., McKenna v. Pacific Rail Service*, 817 F.Supp.2d 498 (D. N.J. 1993).  ("The failure of the plaintiffs to make any claim for front pay . . . was prejudicial to the defendant, because defendant was thus never placed on notice – either actual or constructive – that front pay was an issue in this case.")  To allow Plaintiff to seek front pay based on the ADA or the FCRA would be prejudicial to Defendants because the trial is complete, and all relevant evidence has been entered.

B.     **Plaintiff Has Waived Any Claim For Front Pay Under The FMLA.**

With respect to Plaintiff's FMLA claims, Plaintiff also is not entitled to front pay, because she failed to make a claim for front pay in the Joint Pretrial Stipulation (Doc. 154) at

all.[14]  "The pretrial order supersedes the pleadings and controls the subsequent course of

litigation."  *Hullman v. Board of Trustees of Pratt Community College*, 950 F.2d 665, 667 (10th

Cir. 1991).

> The pretrial order "shall control the subsequent course of the action unless modified by a subsequent order.  The order following a final pretrial conference shall be modified only to prevent manifest injustice." Fed.R.Civ.P. 16(e). "If pretrial orders are to achieve their intended purpose, 'courts and litigants must ordinarily take them seriously.'"  *Correa v. Hospital San Francisco*, 69 F.3d 1184, 1195 (1st Cir.1995) (quoting authority omitted), *cert. denied*, 517 U.S. 1136, 116 S.Ct. 1423, 134 L.Ed.2d 547 (1996).  The failure to state the damages that the plaintiff is specifically seeking in the pretrial order waives that claim for relief.  *See, e.g., Reich v. Tiller Helicopter Services, Inc.*, 8 F.3d 1018, 1035 n. 12 (5th Cir.1993) (by omitting a claim for back pay from the complaint the Secretary waived the right to seek that relief).

*Ramos v. Davis & Geck, Inc.*, 968 F.Supp. 765, 770-771 (D. P.R. 1997).

Plaintiff did not request front pay in the Pretrial Stipulation[15], did not move to amend the

Pretrial Stipulation to include front pay before or during the trial, and did not present sufficient

evidence during trial to show that she is entitled to such.  (See Section II.D. below, for additional

discussion on Plaintiff's failure to present sufficient evidence of front pay.)  Accordingly, front

pay should not be awarded.  *See, e.g., Murphy v. City of Elko*, 976 F.Supp. 1359, 1365 (D. Nev.

1997) (holding that plaintiff waived her claim for front pay even though she listed front pay in

the Prayer for Relief of her Second Amended Complaint, because she failed to mention it in

---

[14]  In its Scheduling Order (Doc. 6), this Court required the parties to file a joint pre-trial statement in accordance with Local Rule 16.1 which requires, in part, a statement of "the precise nature and extent of damages claimed."  S.D. Fla. L.R. 16.1(e)(6)(B).

[15]  Plaintiff's inclusion of the phrase "[t]he amount of damages Mrs. Jorud has suffered as a result of Defendants' alleged acts" in the "Questions of Fact" section of the Pretrial Stipulation (Doc. 154 at 7) does not constitute a request for front pay, both because of the statement's vagueness and because front pay is a question of law for the Court.  Likewise, Plaintiff's inclusion of the phrase "[w]hether Mrs. Jorud is entitled to any damages" in the "Contested Issue of Law" section of the Pretrial Stipulation (Doc. 154 at 11) is too vague to indicate front pay, especially in light of the use of the more specific terms "liquidated damages" and "punitive damages" in the sections immediately following.  Finally, the Pretrial Stipulation does not request or otherwise mention reinstatement, the counterpart to front pay.

either the pretrial order or her trial brief); *Hardin v. Caterpillar, Inc.*, 1999 WL 960034, *2 (N.D. Miss. May 28, 1999) (holding that plaintiff waived any claim to front pay under the FMLA by not mentioning it in the pretrial order).

In the Pretrial Stipulation, there is a reference to the Second Amended Complaint (which requests front pay under the FMLA – see Section II.A. above). Doc. 154 at 4. This vague cross-reference is insufficient to save the front pay claim under the FMLA. In the unlikely event the Court finds that the cross-reference in the Pretrial Stipulation to the Second Amended Complaint saves the front pay claim under the FMLA, which Defendants urge this Court not to do, Plaintiff would still be barred from recovering front pay under the ADA or the FCRA, since neither the Pretrial Stipulation nor the Second Amended Complaint requests front pay under the ADA or the FCRA.

      **C.**    **Even If Plaintiff Had Not Waived Her Claim For Front Pay, An Award Of Front Pay Is Not Appropriate In This Case.**

          1.    <u>Front Pay is Not Available **B**ecause Plaintiff Has Not Requested Reinstatement or Shown that Reinstatement would be Ineffective</u>.

The FMLA does not specifically permit front pay to be awarded. However, some courts have found front pay is available because the FMLA provides for equitable remedies. *See, e.g., Quitto v. Bay Colony Golf Club, Inc.*, 2007 WL 4098847, *3 (M.D. Fla. Nov. 15, 2007). Still, the preferred equitable remedy is reinstatement. *See id* (noting that reinstatement is the preferred equitable remedy under the FMLA)*; Downey v. Strain,* 510 F.3d 534, 544 (5th Cir. 2007) (same).[16]

---

[16] Courts generally apply the same standards for front pay awards in all employment discrimination contexts and thus cases deciding entitlement to front pay under the FMLA often rely on cases discussing front pay in other contexts, such as Title VII. *See, e.g., Quitto*, 2007 WL 4098847, *3 (an FMLA case relying on *U.S. E.E.O.C. v. W&O, Inc.*, 213 F.3d 600, 619 (11th Cir. 2000), a Title VII case). Additionally, because the remedial provisions of the FMLA

Here, Plaintiff has not requested reinstatement, nor has she shown extenuating circumstances which would make reinstatement ineffective. Thus, front pay should not be awarded. *See U.S. E.E.O.C. v. W&O, Inc.*, 213 F.3d 600, 619 (11th Cir. 2000) (vacating award of front pay where district court failed to make factual findings as to "whether reinstatement is viable"); *McKelvy v. Metal Container Corp.*, 674 F.Supp. 827, 832 (M.D. Fla. 1987) ("Based on plaintiff's failure to prove that reinstatement is not viable, plaintiff is not entitled to front pay as an alternative to reinstatement."); *Hill v. Xerox Corporation*, 998 F.Supp.2d 1378 (N.D.Fla.1998) (holding that reinstatement, not front pay, was the appropriate remedy where, among other reasons, employer was a large corporation with many positions available to plaintiff so he would not have to encounter the same people who had previously discriminated against him); *Hite v. Vermeer Mfg. Co.*, 361 F.Supp.2d 935, 944 (S.D. Iowa 2005) ("Front pay is a disfavored remedy that may be awarded in lieu of reinstatement, but not in addition to it, where the circumstances make reinstatement impractical."). As Plaintiff has not presented any evidence that reinstatement would be ineffective, her demand for front pay should be denied.

   2.   Front Pay is Not Available because Plaintiff's Illness Would Have Prevented her from Returning to Work Even if She Had Taken All Twelve Weeks of FMLA Leave.

Even if Plaintiff could show that reinstatement was not a viable option, that "does not mean that an award of front pay is required." *Arban v. West Publ'g Corp.*, 345 F.3d 390, 406

---

were drafted to mirror the remedial provisions of the Fair Labor Standards Act ("FLSA"), FLSA case law is helpful in interpreting FMLA remedial issues such as front pay and liquidated damages. *See Nero v. Industrial Molding Corp.*, 167 F.3d 921, 928 (5th Cir. 1999) (citing *Frizzell v. Southwest Motor Freight*, 154 F.3d 641, 644 (6th Cir.1998) and S.ReNo. 103-3, at 35 (1993), reprinted in 1993 U.S.C.C.A.N. 3, 37 ("[The FMLA's] enforcement scheme is modeled on the enforcement scheme of the FLSA .... The relief provided in FMLA also parallels the provisions of the FLSA.")).

(6th Cir. 2003).  *See also Mock v. Bell Helicopter Textron, Inc.*, 2007 WL 2774230, *8 (M.D. Fla. Sept. 24, 2007) (same).

An employee has no right to reinstatement – and, therefore [front pay] damages – if, at the end of [her] twelve-week period of leave, [s]he is either unable or unwilling to perform the essential functions of [her] job. *Follis v. Memorial Medical Center,* 2010 WL 431920, *4 (C.D. Ill. Jan. 29, 2010) (internal quotes omitted).   FMLA Regulations promulgated by the U.S. Department of Labor make clear that:

> If the employee is unable to perform an essential function of the position because of a physical or mental condition . . . the employee has no right to restoration to another position under the FMLA . . . .

29 C.F.R. § 825.216(c).

Here, Jorud's testimony indicates that, even if she had taken a full twelve (12) weeks of FMLA leave, she was too ill to resume her position as a full-time Store Manager.  *See* Trial Tr. 336[17], 347[18], 349[19], 351[20], and 380[21].  Accordingly, her request for front pay should be denied.

3.    Front Pay is Not Available because Such an Award Would Overcompensate Plaintiff.

Additionally, Jorud should not be awarded front pay because such an award would result in overcompensation.  "A trial court must 'temper' the use of front pay by recognizing 'the

---

[17] Plaintiff testified that she was "bald," "pale," and could not go through a few hours without throwing up.

[18] Plaintiff testified she was unable to find a job after leaving Michaels because she was "bald," "pale," and throwing up as a result of harsh chemotherapy.

[19] Plaintiff testified that she had digestive problems which, at times, caused her not to be able to hold food down for a week.

[20] Plaintiff testified that she slept about three hours a night as a result of the mastectomy.

[21] Plaintiff testified in her deposition (read at trial) that she was too sick and "not ready to come back" to work at Michaels following her first few rounds of chemotherapy.

potential for windfall' to the plaintiff." *Dotson v. Pfizer, Inc*., 558 F.3d 284, 300 (4th Cir. 2009). *See also Lewis v. Federal Prison Industries, Inc.* 953 F.2d 1277, 1281 (11th Cir. 1992) ("'Because of the potential for windfall, [the] use [of front pay] must be tempered.'") (quoting *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991)). "Front pay remains a special remedy, warranted only by egregious circumstances." *Lewis*, 953 F.2d at 1281. "Front pay, therefore, is appropriate only when the other damages awarded will not fully compensate the plaintiff for his injury." *Gerry v. City of Hialeah*, 152 F.Supp.2d 1350, 1351 (S.D. Fla. 2001) (quoting *Weaver v. Casa Gallardo*, Inc., 922 F.2d 1515, 1529 (11th Cir.1991)).

Particularly in a case such as this where a plaintiff seeks both liquidated damages and front pay, the court must be careful that the plaintiff is not overcompensated. *See, e.g., Dotson*, 558 F.3d at 300-01 (affirming denial of front pay to FMLA plaintiff and approving the district "court's consideration of the role played by the liquidated damages in making [the plaintiff] whole").

> In *Avitia*, Judge Posner cautioned that district courts should guard against being "overly generous" when awarding front pay in cases where an employee receives liquidated damages. Specifically, <u>an award of front pay on top of liquidated damages may cause overcompensation</u>.

*Miller v. Paradise of Port Richey, Inc*., 75 F.Supp.2d 1342, 1346-47 (M.D. Fla. 1999) (citations omitted, emphasis added) (denying request for front pay where "the Court has received no evidence that an award of front pay would be appropriate, nor has the plaintiff shown how such an award would act to effectuate the purposes of [the FLSA].").

Here, the jury verdict awarded Plaintiff a total of $100,722 in back pay, $4 million in pain and suffering, and $4 million in punitive damages.[22]   Plaintiff is also seeking liquidated

---

[22] These damages are, of course, subject to the statutory caps imposed by the interplay of the ADA and the FCRA.  *See* 42 U.S.C. § 1981a (limiting compensatory and punitive damages to a

damages, attorneys' fees and costs, and interest.  *See* Doc. 13.  Defendants maintain that these awards are excessive and quite larger than what is supported by the evidence.  Thus, Plaintiff will certainly be made whole by way of these large damage awards, making a front pay award unwarranted.  *See, e.g., Quitto*, 2007 WL 4098847 at *3 (declining to award front pay "because it is not necessary to make plaintiff whole, i.e., to restore him to the economic position he would have occupied but for the illegal conduct by defendant" where the plaintiff was currently employed and received an award of economic damages, liquidated damages, and punitive damages that fully compensated plaintiff for the past misconduct by defendant.); *Palma v. Pharmedica Communications, Inc.*, 2003 WL 22750600, *3-4  (D. Conn. Sept. 30, 2003) (holding that "[a]n award of front pay is not warranted here, as the Court finds that the compensatory and liquidated damages of $280,000 plus interest sufficiently meet the goal of making plaintiff whole."); *Reynolds v. Octel Communications Corp.*, 924 F.Supp. 743, 748 (N.D. Tex. 1995) (denying front pay because "the jury awarded Reynolds more than the statutory maximum amount of compensatory and punitive damages permitted under Title VII.").

In the instant case, Plaintiff did not show <u>any</u> injury stemming from her claim of FMLA interference, let alone any injury that would make an award of front pay appropriate.  The jury specifically found that Plaintiff's termination was *not* a result of her FMLA leave – i.e., the jury found in favor of Plaintiff on her FMLA <u>interference</u> claim only, not her FMLA <u>retaliation</u> claim.  *See* Doc. 198 at 2.  Plaintiff did not, and could not, present any evidence of other damages stemming from her interference claim because she was provided with all the leave to which she was entitled.  *See* Trial Tr. at 367; *Billups v. Tampa Sports Authority*, 2007 WL

maximum total of $300,000 per complaining party); Fla. Stat. § 760.11(5) ("The judgment for the total amount of punitive damages awarded under this section to an aggrieved person shall not exceed $100,000.").

4093232, *9 (M.D. Fla. 2007) ("a plaintiff suffers no FMLA injury when she receives all the leave she requests").  Accordingly, Plaintiff is not entitled to equitable remedies, such as front pay.  *See id.*  ("[T]he FMLA provides for neither emotional distress damages nor nominal damages, and equitable relief is not appropriate in the absence of an FMLA injury."  citing *Rodgers v. City of Des Moines*, 435 F.3d 904, 909 (8th Cir.2006) ("Because [the plaintiff] suffered no prejudice, the FMLA provides no equitable relief")).  Even if Plaintiff had suffered an injury as a result of the alleged FMLA interference, by finding for Defendants on the FMLA retaliation claim, the jury found that Plaintiff's termination was not an injury related to her exercise of her FMLA rights.  Accordingly, the only damages Plaintiff could possibly have suffered as a result of FMLA interference would have arisen <u>prior</u> to her termination, thus making an award of (post-termination) front pay inappropriate.

    4.    <u>Plaintiff is Not Entitled To Front Pay because She Failed to Mitigate Her Damages by Seeking Substantially Equivalent Employment.</u>

Plaintiff "must mitigate her damages by seeking employment 'substantially equivalent' to the position [from which] she was [terminated]."  *See E.E.O.C. v. Joe's Stone Crab*, 15 F.Supp.2d 1364, 1378 (S.D. Fla. 1998) (citing *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1526 (11th Cir.1991)).  "'In order to qualify for front pay, a plaintiff must have been diligent in seeking comparable employment . . . .'" *Palma*, 2003 WL 22750600 at *3 (quoting *Rivera v. Baccarat*, 34 F.Supp.2d 870, 878 (S.D.N.Y.1999)).  "The duty to mitigate damages by seeking employment elsewhere will, . . . , limit the amount of front pay available." *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1562 (11th Cir.1988) (citation omitted).  *See also Massie v. Indiana Gas Co.*, 752 F.Supp. 261, 271 (S.D. Ind. 1990) ("'It is clear that front pay awards, like backpay [sic] awards, must be reduced by the amount plaintiff could earn using reasonable mitigation efforts.'") (quoting *Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338, 1347 (9th Cir.1987)).

At trial, Jorud testified that she currently works for Home Goods as a receiving coordinator, has worked there since approximately September 2009, and is paid ten dollars an hour.   Trial Tr. at 189.   Jorud presented no evidence of any efforts to seek employment opportunities after December 10, 2008, and thus no evidence to obtain a higher paying job than the non-management one she currently holds.   *See* Plaintiff's Trial Exh.  107.   In addition to presenting no evidence of her attempts to find a job substantially equivalent to her position at Michaels between her termination in October 2008 and her taking the Home Goods job in approximately September 2009, Jorud likewise presented no such evidence between September 2009 (when she took the Home Goods job) and the present.

> Without any evidence of an effort to seek a higher paying position, or even a position comparable in pay and responsibilities to her job at [plaintiff's former employer], the Court can only conclude that plaintiff is content to remain at her current job at the current rate of pay.  *Miller v. AT & T*, 83 F.Supp.2d 700, 709 (S.D. W.Va. 2000) ("A successful FMLA plaintiff cannot simply reevaluate her career goals, accept a lesser paying job, and receive the same amount of compensation as before through front pay."); *Hine v. Mineta*, 238 F.Supp.2d 497, 501 (E.D.N.Y. 2003) (finding "plaintiff had a duty to seek "suitable" other employment.").

*Palma*, 2003 WL 22750600 at 4.  Accordingly, any request for front pay should be denied.

### D.   Even If Front Pay Damages were Appropriate, Plaintiff's Evidence is Too Speculative to Establish an Amount for Such Damages.

Front pay damages are inherently speculative.   Thus, plaintiffs must prevent sufficient evidence to support the amount of front pay they request.  *See Arban v. West Pub. Corp.*, 345 F.3d 390, 407 (6th Cir. 2003) ("A plaintiff who seeks an award of front pay must provide the district court with the essential data necessary to calculate a reasonably certain front pay award.") quoting *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 862 (7th Cir.2001).  Here, the only evidence presented by Plaintiff regarding front pay is the testimony of Dr. Pettingill.  *See* Trial Tr. at 738-763.

Dr. Pettingill's testimony was vague and unsupported, and did not provide the type of specificity required to ascertain front pay damages. See Trial Tr. 738-763.   In *Hudson v. Chertoff*, the Southern District of Florida explained that a plaintiff must present competent evidence in order to be entitled to front pay:

> [T]he plaintiff was not entitled to front pay not only because of [the plaintiff's] failure to mitigate her damages, but also because [the plaintiff] failed to "produce 'competent evidence suggesting that [her] injuries have narrowed the range of economic opportunities available to [her]' " or that " 'her injury has caused a diminution in [her] ability to earn a living.' "

*Hudson v. Chertoff*, 473 F.Supp.2d 1292, 1302 (S.D. Fla. 2007) (quoting *Richardson v. Tricom Pictures & Productions, Inc.*, 334 F.Supp.2d 1303, 1319 (S.D. Fla. 2004)).

Dr. Pettingill testified that he only "crunched the numbers" based on instructions from counsel.  Trial Tr. at 744, lines 16-18.  Dr. Pettingill did not even review Jorud's current or past job descriptions and gave no opinion regarding her ability to obtain employment.  Trial Tr. at 759.  Moreover, he did not take into consideration any possible promotion opportunities for Plaintiff.  Trial Tr. at 744-745, 760.  Dr. Pettingill also added to his figures the cost of services – which he admitted has no relationship to Plaintiff's termination from Michaels and thus, is irrelevant to front pay.  Trial Tr. at 750-51, 756.

Plaintiff herself presented no evidence to suggest that her range of economic opportunities were narrowed due to Defendants' alleged interference with her rights under the FMLA.  Instead, Jorud testified that her ability to obtain employment was <u>reduced by her cancer</u>, not by Michaels.  Trial Tr. at 347.  Plaintiff also admitted that <u>her cancer was not caused by Michaels</u>.  Trial Tr. at 383.[23]

---

[23] At trial, Jorud maintained that the stress from Michaels' actions made her cancer worse.  Even if she could prove this claim, it is irrelevant to her FMLA claim or her request for front pay.  *See Graham v. State Farm. Mut. Ins. Co.,* 193 F.3d 1274, 1284 (11th Cir.1999) ("FMLA does not

A monetary award of front pay is calculated to terminate on the date a victim of a discrimination attains an "opportunity to move to her 'rightful place.'" *Vroman v. Volusia County, Fla.*, 2009 WL 395501, *1 (M.D. Fla. Feb. 17, 2009) (quoting *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1529 (11th Cir.1991) (superseded by statute on other grounds)).  An award of front pay is "intended [neither] to insure a plaintiff's future financial success," *Id.* (quoting *McKnight v. General Motors Corp.*, 973 F.2d 1366, 1371 (7th Cir.1992)), nor to subsidize the plaintiff for the remainder of his working life, *Id.* (citing *Hipp v. Liberty National Life Insurance. Co.*, 29 F.Supp.2d 1314, 1321-22 (M.D.Fla.1998)).

Because Plaintiff has testified that it was her cancer that affected her ability to find subsequent employment, and not any action by Defendants, Plaintiff had the same "opportunity to move to her rightful place" immediately after her termination as she did immediately prior to her termination.  Therefore, she is not entitled to front pay.  *See, e.g., Harley v. Health Center of Coconut Creek, Inc.*, 2008 WL 155045, 3 (S.D. Fla. Jan. 10, 2008) (no front pay when "Plaintiff has not sufficiently shown that her alleged inability to find comparable work and salary is due to her employment for Defendants as opposed to [issues with] her subsequent employment. . . .").

Additionally, Plaintiff presented no evidence whatsoever regarding the duration for which she seeks front pay.  Plaintiff's expert witness gave two estimates of front pay based on

---

does not allow recovery for mental distress or the loss of job security"); *Johnson v. Georgia Television Co.*, 435 F.Supp.2d 1237, 1240-41 (N.D. Ga. 2006) (holding that where a defendant's failure to reinstate a plaintiff aggravated that plaintiff's fibromyalgia, rendering her unable to work, damages of future lost wages and employment benefits were consequential damages and unrecoverable under the FMLA); *Breneisen v. Motorola, Inc.*, 2009 WL 1759575, *10 (N.D. Ill. June 22, 2009) ("Medical evidence related to front pay damages is not relevant [to Plaintiff's FMLA claim].  If [Defendant]'s conduct physically harmed [Plaintiff], [Plaintiff]'s remedies are under tort and workers' compensation laws."); *Dawson v. Leewood Nursing Home, Inc.*, 14 F.Supp.2d 828 (E.D. Va. 1998) (holding that former employee could not recover damages from her employer, under FMLA, for cardiac and pulmonary symptoms exhibited a few days after employer allegedly violated FMLA by telling her she could not have her old job back).

different life expectancies, but provided no justification for awarding Plaintiff front pay through her date of retirement in either scenario.  In fact, Plaintiff's expert testified only that, if the jury found in her favor, she would be entitled to an amount somewhere between zero and the top figure of his calculation.  Trial Tr. at 761.

Based on the scant evidence presented by Plaintiff, it appears that she is requesting front pay for at least ten (10) years.  Plaintiff's expert did not testify which duration, if any is appropriate here, or explain why ten (10) years is an appropriate estimate of either Plaintiff's work-life expectancy or the amount of front pay she may be entitled to from Defendants.  There is simply no justification for an award of front pay over such a long duration.  In *Hudson v. Chertoff*, the Southern District of Florida awarded front pay for 18 months from the date of the trial.  473 F.Supp.2d at 1302 (citing with approval *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1056-56 (7th Cir.1990) (which found that five (5) years was too speculative) and *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 890 (3d Cir.1984) (affirming four months of front pay because a longer period would be speculative)).

Furthermore, front pay should be denied because Plaintiff's expert's calculations take into account inflation only, with no consideration for the trends in her earnings.  *See* Trial Tr. at 759-760; *Harley*, 2008 WL 155045 at *3 ("Front pay has . . .  been denied where 'Plaintiffs' expert failed to take account of the trends in Plaintiffs' earnings, an appropriate consideration in calculating lost earnings.'  *Hipp v. Liberty Nat. Life Ins. Co.*, 39 F.Supp.2d 1359, 1361 (M.D. Fla. 1999) *citing Buckley v. Reynolds Metals Co.,* 690 F.Supp. 211, 217 (S.D.N.Y.1988)).").  In coming up with his calculations, Dr. Pettingill assumed that Plaintiff would stay in her current position for the duration of her work-life expectancy, without any promotions or raises beyond

inflation rates.  Trial Tr. at 744-745, 760.  Such assumptions ignore the Plaintiff's duty to seek substantially equivalent employment.

Finally, Plaintiff's expert's calculations should be disregarded because they are based on a hypothetical situation in which Plaintiff would "miraculously be cured" from her cancer.  Trial Tr. at 756.  According to Plaintiff, she continues to suffer from cancer-related illness and issues. Trial Tr. at 348-50.  Plaintiff's expert's calculations are based on facts not present in this instant case and as such are unreliable.

### E.       Conclusion.

As to Plaintiff's entitlement for front pay under the ADA and FCRA, she has waived that claim.  As to front pay for Plaintiff's FMLA interference claim, she has either waived that claim or is not entitled to it since (1) she did not request reinstatement and has not prevented evidence that reinstatement is ineffective; (2) she could not have returned to work after taking her full twelve weeks of FMLA leave; (3) she would be overcompensated should she be awarded front pay; (4) she did not mitigate her damages by seeking substantially equivalent employment; and (5) even if an award of front pay were appropriate, Plaintiff's evidence is too speculative to establish the amount.  As such, Plaintiff's demand for front pay should be denied.

### III.    PLANTIFF IS NOT ENTITLED TO LIQUIDATED DAMAGES.

Plaintiff requested an award of liquidated damages, by her Second Amended Complaint, for Defendants' alleged violations of the FMLA.  *See* Counts I and II, Doc. 13.  With respect to these claims, the jury only found in favor of Plaintiff on Count I – for interference.  *See* Doc. 198 at 2.  Therefore, Plaintiff is not entitled to an award of liquidated damages based on any allegation or facts associated with Defendants' alleged retaliation based on her FMLA leave, since the jury found in favor of Defendants with respect to the FMLA retaliation claim.

Plaintiff has made no motion requesting liquidated damages. However, this Court ordered Defendants to brief the issue of liquidated damages on or before September 29, 2010. Accordingly, Defendants submit this brief in compliance with that order. Defendants respectfully request that they be allowed to supplement this brief after Plaintiff briefs this issue.

A.      **Defendants Acted in Good Faith.**

The FMLA statute explains the good faith defense, in the context of FMLA damages, as follows:

> an additional amount as liquidated damages equal to the sum of the amount described in clause (i) [backpay] and the interest described in clause (ii), except that if an employer who has violated section 2615 of this title proves to the satisfaction of the court that the act or omission which violated section 2615 of this title <u>was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 2615 of this title</u>, such court may, in the discretion of the court, reduce the amount of the liability to the amount and interest determined under clauses (i) and (ii), respectively . . . .

29 U.S.C. § 2617(a)(1)(A)(iii) (emphasis added).

There is very little case law regarding the good faith defense under the FMLA. However, because the remedial provisions of the Family and Medical Leave Act were drafted to mirror the remedial provisions of the Fair Labor Standards Act, FLSA case law is helpful in interpreting FMLA remedial issues such as front pay and liquidated damages. *See Nero v. Industrial Molding Corp.*, 167 F.3d 921, 928 (5th Cir. 1999) (citing *Frizzell v. Southwest Motor Freight*, 154 F.3d 641, 644 (6th Cir.1998) and S.ReNo. 103-3, at 35 (1993), reprinted in 1993 U.S.C.C.A.N. 3, 37 ("[The FMLA's] enforcement scheme is modeled on the enforcement scheme of the FLSA .... The relief provided in FMLA also parallels the provisions of the FLSA.")).

Good faith and liquidated damages are matters for the Court to decide, not the jury. *See Feniger v. Cafe Aroma 2007* WL 853735, *3 (M.D. Fla. Mar. 16, 2007) ("The question of

33

whether the good faith defense applies is an issue of mixed law and fact for the Court, not the jury, to determine.") (citing 29 C.F.R. § 790.22(b)-(c)); *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1163 (11th Cir. 2008) (holding "the Act assigns to the judge the role of finding whether the employer acted in subjective and objective good faith for liquidated damages purposes."); *Medley v. Polk Co.*, 260 F.3d 1202, 1208-09 (10th Cir. 2001) (stating that trial court is required to make good faith assessment in FMLA case).

In the instant case, the Court asked the jury for an advisory verdict on the issue of good faith. This advisory verdict, however, is not binding on this Court and the issue of good faith should be ascertained *de novo. See, e.g., Alvarez Perez*, 515 F.3d at 1163; *DePaola v. Nissan North America, Inc*., 2008 WL 4710532, *4 (M.D. Ala. Oct. 24, 2008) ("The verdict of an advisory jury . . . is not binding on the trial judge."); *Skyywalker Records, Inc. v. Navarro*, 739 F.Supp.2d 578, 590 (S.D. Fla. 1990) ("Federal Rule 39(c) . . . allows for use of an advisory jury whose verdict is not binding on the court."); *Miles-Hickman v. David Powers Homes, Inc.*, 613 F.Supp.2d 872 (S.D. Tex. 2009) (holding that court is not bound by the findings of an advisory jury and is free to adopt them in whole or in part or to totally disregard them).

Since the jury found that Defendants did not retaliate against Plaintiff for taking FMLA leave, Plaintiff is entitled to liquidated damages **only with respect to and based on facts involving her claim for FMLA interference**. Accordingly, the question to be decided here is whether Defendants acted in good faith with regard to Plaintiff's request for FMLA leave, not whether Defendants acted in good faith in terminating Plaintiff's employment.

To satisfy the good faith requirement, an employer must show that it acted with both subjective and objective good faith, and upon such reasonable grounds that it would be unfair to impose upon it more than a compensatory verdict. *Wajcman v. Investment Corof Palm Beach*,

620 F.Supp.2d 1353, 1358 (S.D. Fla., 2009) (citations and quotations omitted).  To demonstrate

the underlined subjective component, an employer must show that it had "an honest intention to ascertain

what the [statute] requires and to act in accordance with those requirements."  *Id.* (quoting

*Feniger v. Cafe Aroma,* 2007 WL 853735, *3 (M.D. Fla. March 16, 2007) (*citing Dybach v.*

*State of Fla. Dep't of Corr.,* 942 F.2d 1562, 1566 (11th Cir.1991)).  Proving the underlined objective

underlined component of the good faith defense requires the employer to demonstrate that it had a

reasonable belief that its conduct conformed with the statute.  *Id.*  If the employer can

demonstrate that it had both a subjective belief that it was compliant with the statute and that it

also had an objectively reasonable basis for its belief, then the Court may apply the safe harbor

provision and limit or deny an award of liquidated damages.  *Id.*

Plaintiff's own testimony demonstrates that Defendants did everything they could to

accommodate her need for leave and inform her of her rights and obligations under the FMLA

and, in fact, provided her with all of the leave she requested.  Thus, Defendants have

demonstrated an honest intention to comply with the law as well as a reasonable belief that their

conduct conformed with the FMLA.

Most significantly, Plaintiff testified that she received all FMLA leave which she

requested.  Trial Tr. at 367.  Plaintiff also testified that when she first began feeling ill, in

approximately February of 2008, Michaels "did not hesitate" to accommodate her need for time

off for medical appointments.  *See* Trial Tr. at 203.  Then, in June of 2008, when Jorud informed

Skip Sand that she had been diagnosed with lupus, his first question to her was whether she

needed time off from work.  Trial Tr. at 207.  In August of 2008, Jorud told Sand that she would

likely be out for three weeks to have surgery and recover from it, and Sand did not have a

problem with that.  Trial Tr. at 216.  Jorud testified that, shortly thereafter, Shawn Gingrich from

human resources contacted her regarding her diagnoses and her need for leave.  Trial Tr. at 217.

Additionally, Plaintiff testified that she received a letter, detailing her rights and obligations

under the FMLA, on or about September 10, 2008 and another one on or about October 8, 2008.

Trial Tr. at 234-235; Plaintiff's Trial Exh. 48; Trial Tr. at 293-294; Plaintiff's Trial Exh. 35.

Plaintiff was absent from work for approximately five weeks for surgery – from August 8, 2008

to September 15, 2008.  Trial Tr. at 242.  Plaintiff was granted this leave without any discipline.

*Id*.

When Plaintiff complained via email to Michaels' Vice President of Operations Nick

Crombie that she felt she was being treated poorly due to her illness, Michaels' response was

immediate.  Michaels' VP of Human Resources, Mike Stine, called Jorud to discuss her concerns

in detail and attempt to resolve them.  Trial Tr. at 281-82.  Mr. Stine assured her that Michaels

cared.  Trial Tr. at 372.  Then, on October 8, 2008, Mr. Crombie came to Jorud's store and met

with her in person to try to resolve all of the problems she indicated she was experiencing.  Trial

Tr. at 291-92, 379-80.  Soon after this meeting with Mr. Crombie, Mr. Sand met with Jorud and

apologized to her.  Trial Tr. at 381.  Based on the above, Michaels and Mr. Sand have

demonstrated that they had a reasonable belief that their conduct conformed with the FMLA, and

therefore, was in good faith.

### B.      Conclusion.

Regarding Plaintiff's request for liquidated damages, Plaintiff Defendants have

demonstrated they acted in good faith when granting Plaintiff's FMLA leave request.  Therefore,

any request for liquidated damages should be denied.

For the reasons stated herein, Defendants respectfully request this Court grant its motion for directed verdict on Plaintiff's hostile work environment claims and that Plaintiff's requests for front pay and liquidated damages be denied.

**DATED** on this 29th day of September 2010.

Respectfully submitted,

*/s/ Helen A. Palladeno*
Helen A. Palladeno
Florida Bar No.: 0186831
Monica J. Williams
Florida Bar No.: 0566780
OGLETREE, DEAKINS, NASH, SMOAK
    & STEWART, P.C.
100 North Tampa Street,   Suite 3600
Tampa, Florida  33602
Telephone:  813.289.1247
Facsimile:  813.289.6530
helen.palladeno@ogletreedeakins.com
monica.williams@ogletreedeakins.com


L. Gray Geddie, Esq.
*Admitted Pro Hac Vice*
OGLETREE, DEAKINS, NASH, SMOAK
    & STEWART, P.C.
P.O. Box 2757
Greenville, South Carolina,  29602
Telephone:  864-271-1300
Facsimile:  864-235-8806
gray.geddie@ogletreedeakins.com

TRIAL ATTORNEYS FOR DEFENDANTS

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on this 29th day of September 2010, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to Plaintiff's counsel, Gerard Joseph Curley, Jr., Esq. and Brian McPherson, Esq. at jcurley@gunster.com and bmcpherson@gunster.com.

**I FURTHER CERTIFY** that to the best of my knowledge there are not any non-CM/ECF participants that require notification of this response via U.S. Mail.

*/s/ Helen A. Palladeno*
Helen A. Palladeno